IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 20, 2021 Session

## IN RE BRAYLEE B.

**Appeal from the Chancery Court for Scott County**
**No. 11106    Elizabeth C. Asbury, Chancellor**

———————————————————

## No. E2020-01408-COA-R3-PT

———————————————————

John B. ("Father") appeals the termination of his parental rights to the minor child, Braylee B. ("the Child"). In September 2019, Brook W. ("Mother") and Charles W. ("Stepfather") filed a petition to terminate Father's parental rights in the Scott County Chancery Court ("Trial Court"). Father filed a motion to compel discovery and continue the trial, which was denied by the Trial Court. Following a trial, the Trial Court terminated Father's parental rights on two grounds of abandonment due to Father's failure to support the Child and his wanton disregard for the Child's welfare. The Trial Court further found by clear and convincing evidence that termination of Father's parental rights was in the Child's best interest. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KRISTI M. DAVIS, JJ., joined.

Timothy P. Webb, Duff, Tennessee, for the appellant, John B.

Charles W. and Brook W., Oneida, Tennessee, Pro Se.

## OPINION

### Background

Mother and Father were married in 2014. The Child was born in December 2015.[1] The Trial Court found that Mother and Father had resided together intermittently until his

---

[1] Mother had a second child, E.B., while she was still married to Father. During the divorce proceedings,

most recent incarceration in May 2018. Mother and Father were divorced in January 2019 by order of the Scott County General Sessions Court. Father was incarcerated during the entirety of the divorce proceedings. Mother was designated the primary residential parent of the Child with Father having no contact with the Child "until such time as the father makes the appropriate application to the Court; and Court approval of parenting rights are established." Father remained incarcerated at the time of trial in the termination of parental rights proceeding.

Mother married Stepfather in June 2019. At the time of trial, the Child had resided with Mother and Stepfather for two or three years. In September 2019, Mother and Stepfather (collectively, "Petitioners") filed a petition in the Trial Court, seeking to terminate Father's parental rights to the Child and to allow Stepfather to adopt the Child. Petitioners subsequently filed a motion for default judgment, alleging that Father was served with process but that he had failed to file a responsive pleading or otherwise defend against the petition. Petitioners requested that their motion for default judgment be granted and that a final hearing be scheduled. In February 2020, Father filed a motion to dismiss, alleging that Petitioners failed to include a statement in the petition that "there is a parent/child relationship between any child and [Father] and for that reason [the petition] is fatally defective." An amended petition was filed in March 2020 with the same grounds for termination, adding the additional language at issue. Father filed a response to the petition denying that grounds existed to terminate his parental rights and that termination of his parental rights was in the Child's best interest. Discovery commenced between the parties.

In July 2020, Father filed a "Request for Production of Documents & Things," which requested Petitioners to "[p]roduce copies of all social media, including, but not limited to, Facebook, Facebook Messenger, Twitter, Instagram, and/or Snapchat posts, pictures and messages from January, 2016 to present." In his request, Father provided directions for obtaining the requested information from Facebook. In their response, Petitioners objected to the request as being overly broad and "not reasonably calculated to lead to the discovery of admissible evidence." According to Petitioners, "this is a fish finding expedition with no basis and [Father's] instructions do not work."

In August 2020, Father filed a "Motion to Compel Compliance with Discovery and/or Motion to Continue," in which he argued that Petitioners had "refused to participate in discovery." The Trial Court addressed the motion during a telephone conference during the week prior to trial and again during trial.[2] At trial, Father argued that he had requested

that child was determined not to be Father's biological child.
[2] Although the transcript refers to a telephone conversation wherein Father's discovery motion was discussed, the record before us does not contain a transcript or an order memorializing what transpired during the telephone conference.

visitation from Mother through Facebook but that he no longer had access to his account. He was, therefore, seeking the messages/posts through discovery. The Trial Court denied the motion for continuance but allowed ten days following trial for Petitioners to attempt to access and provide the "Facebook communication between [Father] and [Petitioners] where he's making inquiry about visiting his child during that relevant time period" from January 2018 through May 2018.

The Trial Court conducted a trial in August 2020, wherein the following witnesses testified: (1) Father, (2) Paula B. ("Paternal Aunt"), (3) Stepfather, (4) Mother, and (5) Judy B. ("Paternal Grandmother"). In September 2020, the Trial Court entered its "Findings of Fact, Conclusions of Law, and Opinion of the Court," which provided as follows:

2. Mother and Father were married to each other when the child was born on December 3, 2015. Father was incarcerated at that time. An ORDER was entered in Scott County General Sessions Court Case No: 2015-CR-770 and 2015-CR-1261 for him to have a 7 day furlough to attend the child's birth. Father was in and out of jail since that time. Mother and Father resided together off and on until his last incarceration in 2018.

3. Mother and Father were divorced per a FINAL DECREE which was entered on . . . January 18, 2019 in the General Sessions Court for Scott County, Tennessee.

4. Mother and Step-Father married on June 23, 2019. The child has resided with Mother and Step-Father since that time.

5. Father is 23 years old. He has a 7th grade education. He currently is incarcerated in the State of Tennessee Prison System. He is serving a five (5) year sentence for robbery and attempted arson. These convictions are in Case Nos: 11338 and 11438 in the Scott County Criminal Court.

6. Prior to receiving the conviction which landed him in prison, Father had other convictions which included the following: August, 2015-a plea to simple possession to a Schedule VI substance in the General Sessions Court for Scott County, Tennessee. October 28, 2015-a plea of Violation of Probation and Possession of Schedule IV Controlled Substance in Scott County, Tennessee. In February, 2016 in Fentress County, Tennessee Court-a guilty plea to failure to appear and a driver's license charge. In August, 2016 a Violation of Probation based on a failure to report, failure to pay and new charges. A drug screen that date showed he was positive for THC, BUP, AMP and Meth. He plead guilty to possession of Schedule III, possession of Schedule IV and violation of probation. In October, 2016 another Violation

- 3 -

of Probation led to Father being assigned to recovery court. In April, 2017 another Violation of Probation was filed due to Father absconding from a recovery center without completion. He then absconded from a second recovery center. May 31, 2017, Father was ultimately terminated from Recovery Court due to failure to comply. He was ordered to remain in jail until November 22, 2017. As aforestated, in December, 2018 he plead guilty to Robbery, a C Felony with a five (5) year sentence to be served as a Range I-30% offender (Scott County Criminal Court Case No: 11338A). Additionally, in December, 2018 he entered a plea to attempted arson with a two (2) year concurrent sentence. Father has been incarcerated since May 5, 2018.

7. From Father's testimony, he has a pending DUI charge in Kentucky which will need to be addressed upon his release from prison.

8. Although Father denies being addicted to drugs, he did admit to being a "drug abuser".

9. Father acknowledged being given the opportunity to participate in Scott County General Sessions Recovery Court. He admitted to leaving Springs of Life Rehabilitation Program. Father blames Mother for leaving Springs of Life because she came and picked him up. He was offered a second opportunity through Recovery Court to participate in the New Beginnings Program from which he also absconded.

10. Father's last employment was with Southern Design Landscaping. Th[is] was the only significant job he had during the marriage to Mother. He worked there for less than one (1) year. He was fired from that job. He had to rely on another individual for transportation. He blamed his carpool buddy for not getting them to work on time. Father has never had a valid driver's license.

11. Father did use inherited money and Mother's income to buy drugs. Father testified that he had no impairment that would interfere with his ability to work.

12. Mother was the regularly employed parent. She provided steady income for the family. With assistance from his family members, Father did, at times, provide vehicles and homes.

13. Before his final incarceration, Mother and Father were on/off in their relationship. Mother described several instances of domestic violence due to Father's conduct. Examples included:

      (a) He threatened to wrap the car around a tree;
      (b) with the child in her arms, he tried to drag her;
      (c) smacked her across the face; and
      (d) while using meth, grabbed her by her neck.

14. Both parties acknowledge that they had sexual relations during the four (4) month period immediately preceding Father's incarceration. A child, [E.B.], was born on August 6, 2018. The parents' divorce decree states that [Father] is not the biological father.

15. Father admits non-payment of child support during the relevant four (4) month period of time prior to his incarceration. However, the parties cohabited periodically during that period of time and he did spend periods of time with the child.

16. Father's sister, [Paternal Aunt], offered credible testimony regarding physical violence during period of times when Father was "out of his mind" and "doing drugs". Further, she described Father as a person not likely to "stay in one spot".

17. Father's sister, [Paternal Aunt], described Mother as her ex-sister-in-law and Step-Father as "the best dad I have ever seen". She has been in the home of Mother/Step-Father and describes it as a new three (3) bedroom home where the children in that home are well taken care of.

18. Mother and Step-Father have a very stable relationship. They have been married for one (1) year. The child has resided with Mother and Step-Father for at least two (2) years. Step-Father is employed as a Sea-Doo technician at a motor sports business. He has worked steadily with that company for four (4) years. Step-Father and Mother have a child named [E.B.] who is the younger one-half biological sister to the child involved in this proceeding.

19. In addition to being employed full-time, Step-Father attends classes to further his education. The family enjoys hunting, fishing, going to the park, and many more outdoor activities.

20. Neither Step-Father or Mother has any criminal history.

21. Mother is enrolled in certified nursing assistant classes. Prior to enrolling as a full-time student, she was employed as an assistant manager with Lee's Food Mart, employed with Fire House Pizza, and other jobs.

22. [Paternal Grandmother] is Father's biological mother. She claims to be fully rehabilitated from a prior pain pill addiction. Father claims she is his support system and will provide him with a suitable home upon his release from prison. According to [Paternal Aunt], [Paternal Grandmother] left her and her then 13 year old brother after their father's suicide. [Paternal Aunt] had to take legal custody of her younger brother (Father) and work in the hay fields and other jobs to support them. [Paternal Grandmother] currently resides in government housing. It would be unlawful for her to let her son live with her once out of prison. She lives in governmental housing and is not allowed to have anyone live with her. [Paternal Grandmother] confirmed that Father has been using illegal drugs since he was a teenager. She admitted seeing him under the influence of alcohol. She is not able to be his primary support system.

23. While still married to Father, Mother relied on her Aunt Tina for childcare because she did not trust Father with the child. Father would take her income and buy drugs. She has seen Father buy drugs "quite a few times". He has used drugs in front of her and the child. She has seen him "shooting up".

24. Mother testified that from January, 2018 through May, 2018, Father visited with the child 5 or 6 times with some of those visits being overnight. The last visit was in March, 2018.

25. Mother states that Father has never adequately supported the child. In the four (4) months period preceding his final incarceration, he provided no support for the child.

(Internal citations omitted.)

Based on the foregoing findings of fact, the Trial Court found by clear and convincing evidence that Father had abandoned the Child by failing to support her financially and by his wanton disregard for her welfare. The Trial Court, however, denied the ground of abandonment by failure to visit. The Trial Court then analyzed the best interest factors as follows:

Factor No: 1: Based on the aforesaid facts, Father has not made appropriate adjustments to his circumstances, conduct, or conditions so as to make it safe or in the child's best interests to be in his home.

Factor No. 2: Father has failed to effect lasting adjustments after reasonable efforts by available social services agencies. He had two (2) opportunities to attend recovery programs. He absconded from both.

Factor No. 3: Father has not maintained regular visitation or contact with the child. Although he has had sporadic and occasional visits, he has not maintained any type of appropriate and regular relationship with the child.

Factor No. 4: Father has not developed a meaningful relationship with the child. He has been in and out of jail since the child's birth. He was in jail at the time of the child's birth. He has been incarcerated since May 5, 2018. The child was two (2) years old at that time.

Factor No. 5: A change of caretakers and physical environment would likely adversely affect the child's emotional and psychological needs. She is in an excellent home situation with her Mother and Step-Father/ Adoptive Father. All of her needs are being met.

Factor No. 6: Inapplicable.

Factor No. 7: Prior to incarceration, Father did engage in drug activity in the home. Mother has seen him "shoot up" in their marital residence. As evidenced by his criminal record, he has been a regular user and abuser of controlled substances so as to render him consistently unable to care for the child in a safe and stable manner.

Factor No. 8: Inapplicable.

Factor No. 9: Although child support has never been set by Court Order, Father has never financially supported this child. Instead, he has used funds to acquire illegal drugs.

OTHER FACTORS:
According [to] the paternal Aunt of this child, Step-Father is an excellent parent figure. He provides financially for the child. He and Mother provide the child with an appropriate home environment. He engages in appropriate activities with the child and with the family. Mother is able to attend classes

to improve her income earning potential. Step-Father has provided Mother and this child with great stability.

The Trial Court, therefore, found that it was in the best interest of the Child for Father's parental rights to be terminated. Following entry of the Trial Court's final judgment, Father timely appealed to this Court.

### Discussion

Although not stated exactly as such, Father raises the following issues for our review on appeal: (1) whether the Trial Court erred by not requiring Petitioners to participate in discovery pursuant to the Tennessee Rules of Civil Procedure and by denying Father's request for continuance, (2) whether the Trial Court erred in finding by clear and convincing evidence that Father abandoned the Child by failing to support her financially and by his wanton disregard for the Child's welfare, and (3) whether the Trial Court erred in finding by clear and convincing evidence that the termination of Father's parental rights was in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

## B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In combination with a best interest finding, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

First, we address Father's issue concerning his motion to compel discovery and to continue the trial in this matter. Regarding pretrial discovery, "[t]he applicable standard of review . . . is abuse of discretion." *West v. Schofield*, 460 S.W.3d 113, 120 (Tenn. 2015). A trial court's denial of a motion for continuance is also reviewed under an abuse of discretion standard. *In re A'Mari B.*, 358 S.W.3d 204, 213 (Tenn. Ct. App. 2011). In *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515 (Tenn. 2010), the Supreme Court discussed the abuse of discretion standard at length, stating:

The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d

- 11 -

838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

Discretionary decisions must take the applicable law and the relevant facts into account. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d at 358; *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 42 (Tenn. 1985).

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signals Controls, Inc. v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed)). When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness. *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d

600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d
at 212.

*Beecher*, 312 S.W.3d at 524-25.

In his discovery request, Father requested Petitioners to provide him with "copies of all social media, including, but not limited to, Facebook, Facebook Messenger, Twitter, Instagram, and/or Snapchat posts, pictures and messages from January, 2016 to present." At the beginning of the hearing, the Trial Court heard arguments concerning Father's motion regarding discovery and a continuance. Father's attorney argued that Petitioners had not provided them anything they had asked for in discovery. Specifically, Father's attorney argued throughout trial that Mother and Father's communication had been primarily through Facebook, and Father had requested visitation from Mother through Facebook. Father, therefore, requested a continuance until the requested discovery could be provided to him, which was denied by the Trial Court. According to Father, the Trial Court erred by failing to require Petitioners to engage in discovery by providing their social media history requested by Father and by denying his motion for continuance.

At the beginning of trial, the Trial Court denied Father's request for continuance stating that "if they couldn't take your directions and produce anything, I can't grant a continuance or do anything about it at this point." Upon the renewal of Father's motion in the middle of trial, the Trial Court inquired with Father's attorney why Father or an agent of Father's could not access the information requested through Facebook. Father's attorney responded that Father had provided his sister with his login information when he went to jail, that counsel doubted that Father's sister would be willing to provide that information based on her testimony, and that if his sister had changed the login information, counsel and Father would not be able to access it. However, as the Trial Court stated, no evidence had been presented to suggest that Father's sister had changed anything concerning the Facebook account. At the conclusion of trial, Father's attorney informed the Trial Court that Father could not access his own Facebook account and acknowledged that he wished to place the burden on Petitioners to provide the requested information through their Facebook account instead. The Trial Court stated to Father that if he wanted this information Petitioners were unable to obtain with his directions, he should have sought the information through Facebook. The Trial Court, however, allowed Petitioners an additional ten days after trial to try to obtain the communications to and from Father from their Facebook account. Nothing further was filed concerning this matter by either Father or Petitioners.

In his appellate brief, Father cites to a criminal case, *State v. Johnson*, 538 S.W.3d 32, 70 (Tenn. Crim. App. 2017), for the proposition that he was permitted to obtain social media information "directly from the witnesses themselves," which was Petitioners in this case. Father takes issues with the Trial Court's statement of "I think you have to get it

through Facebook." However, this comment by the Trial Court at the conclusion of trial followed Father's acknowledgment that he could not say that the requested information from social media still existed at that time but that he had been told that "once something gets on the internet it's there forever, supposedly." When addressing this issue at the beginning of trial, the Trial Court stated:

> I'm not going to grant the motion to continue. It's my understanding that if you really want something from Facebook, you've got to go through a process and subpoena it from Facebook or whoever controls Facebook. But if they [Petitioners] couldn't take your directions and produce anything, I can't grant a continuance or do anything about it at this point. Now, it may be as we go through the trial, depending on what they try to introduce, I may not let it in because of this. We'll just see where we are when we get to that point.

The Trial Court did not rule that Father could not obtain discovery of social media history from Petitioners. Instead, Petitioners were unable to obtain the requested social media history by following the directions provided to them by Father in his discovery request.

Additionally, Father has not provided a convincing reason why he was unable to access his communications to and from Mother through his Facebook account. Father stated only that he did not have access to the account, but he did not provide the Trial Court with any steps Father or an agent on his behalf had taken to access Father's Facebook account or otherwise explain whether additional steps were available to him that could be taken to access his account. At one point, Father counsel's placed blame on Paternal Aunt and speculated that she could have changed the login information; however, no proof was presented to support his theory.

Moreover, Father did not provide an offer of proof to demonstrate what this information would have proven other than his testimony that he and Mother communicated through Facebook concerning the Child, that he had requested visitation with the Child through that forum "several times" two or three days before he was arrested, and that Mother had denied requests from him to visit the Child. This testimony by Father was not contradicted by Mother. Mother acknowledged during trial that Father had reached out to her through Facebook and that she had denied Father a few visits. According to Mother, the last time Father visited with the Child in March 2018 "opened [her] eyes." Mother further stated as follows regarding that March 2018 visit: "[I]t was that time I said, no, this is God's way of showing me if I don't get away, if I don't get my daughter away, I'm going to lose her." Mother did not dispute Father's testimony that she had denied visits to Father prior to his May 2018 incarceration. Further, Father has not shown how this requested information would be relevant to either of the two grounds found by the Trial Court. The Trial Court did not find abandonment by Father's failure to visit. Under these

- 14 -

circumstances, we do not find that the Trial Court abused its discretion by denying Father's motion to compel discovery and for a continuance.

We next address the statutory grounds for termination found by the Trial Court. The Trial Court found that two abandonment grounds existed to terminate Father's parental rights. These two grounds were based upon Father's failure to support the Child financially and his wanton disregard for the Child's welfare. Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2020) provides abandonment by a parent as a ground for the termination of parental rights. Since Father was incarcerated at the time the termination petition was filed, the relevant statute defining abandonment is Tennessee Code Annotated § 36-1-102(1)(A)(iv) (Supp. 2019). We note that the termination petition was filed in September 2019 and that the relevant statute in effect at that time defining abandonment stated as follows in pertinent part:

> For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> * * *
>
> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has failed to visit or has failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A) (Supp. 2019). The relevant statute in effect at the time the petition was filed provided as an affirmative defense that the parent's failure to visit or support was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(I) (Supp. 2019). To prove this defense, a parent must establish his or her lack of willfulness by a preponderance of the evidence. *Id.* We will address the two abandonment grounds in turn. The Trial Court found in its order that Father had been incarcerated since May 5, 2018. Therefore, the relevant four-month period extended from January 5, 2018 through May 4, 2018. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014).

- 15 -

Concerning abandonment by failure to pay child support for the Child, Father argues that he was still married to Mother during the relevant four-month period and that because the parties were married, a finding of this ground to terminate his parental rights "would seem to weigh against public policy." Father explains that in families with only one parent working outside the home with the other a stay-at-home parent, this would be "an automatic ground upon incarceration" to terminate the rights of the non-working parent. However, we find Father's argument to be not persuasive. Father presented no evidence that he had provided for the family as a stay-at-home parent during the relevant four-month period or any other time. The Trial Court found that the parents had lived together "off and on" prior to his most recent incarceration. Father testified that he was in Kentucky for approximately thirty days prior to his incarceration and that he and Mother "had issues" before that. According to Father, he and Mother were still married at that point but not together. Father stated he was in Kentucky around the time he obtained a driving under the influence charge, which he acknowledged occurred in April 2018.[6] According to Paternal Grandmother, Mother had moved out in March 2018. Mother testified that from May 2017 through May 2018, she and Father were not really living together but that "[i]t was just on and off, maybe a couple of days here, couple of days there."

Although Father compares his circumstance to that of a stay-at-home parent, nothing even close to this was proven at trial. The Trial Court found that Father had, at times, provided vehicles and homes for the Child with the help of his family members. However, the Trial Court also found that although Mother had provided a steady income, Father would take the income she had earned to buy drugs. Mother testified that during the first year, she often took the Child to a relative while she worked instead of leaving the Child with Father. Mother testified of an incident that occurred in March 2018 where she left the Child with Father for four hours while she went to work. When picking up the Child, she observed Father to be high, passed out on the couch, and unable to care for the Child, which left the Child in the care of another individual. According to Mother, she was unable to wake up Father so she left with the Child and went to her sister's home. Mother testified that when Father later arrived where Mother was, he did not ask about the Child but asked Mother to take him home and for a peanut butter sandwich. There was no evidence presented that Father had been a stay-at-home parent caring for his Child during the relevant four-month period. We find this argument by Father to be without merit.

Furthermore, the Trial Court found that Father had admitted at trial that he had not financially supported the Child during the four months prior to his incarceration in May 2018. Mother testified that she had not received any support from Father during that time. On appeal, Father acknowledges in his brief that "the strict language of the statute would weigh against [Father]" and that he had a duty to support the Child. Father also points to the divorce decree that was entered after the relevant four-month period where no child

---

[6] This criminal charge was still pending in Kentucky at the time of trial.

support was ordered and he was not allowed contact with the Child. According to Father, Mother had not requested child support during the divorce proceeding and the permanent parenting plan set no monthly child support obligation. Father takes issue with Mother's decision to "waive any support requests, then later use that to buttress her request to terminate his parental rights."

As this Court has held, a parent's failure to financially support or visit a child "is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (internal citations omitted). It is undisputed that there was no child support order in this case in effect during the four-month period. However, the absence of a court order requiring a parent to pay child support does not negate that parent's obligation to pay support. *See In re M.A.C.*, No. M2007-01981-COA-R3-PT, 2008 WL 2787763, at *5 (Tenn. Ct. App. July 17, 2008) ("Though Mother was not under a court order setting support for her children, such an order is not required."). Tennessee Code Annotated § 36-1-102(1)(H) provides that every parent eighteen years old or above is presumed to have knowledge of the legal obligation to financially support his or her children. There was no evidence presented that Mother had interfered with Father's ability to support or prevented Father from providing financial support for the Child.

Although Father argues that he was denied visitation prior to his incarceration, we note that denying a parent visitation with his or her child does not excuse a parent from his or her duty to support that child. *See In re A.T.*, No. M2008-02104-COA-R3-PT, 2009 WL 837704, at *6 (Tenn. Ct. App. Mar. 26, 2009) (Suspension of visitation "does not excuse a parent of his obligation to support his child, as denial of a parent's visitation rights is no defense in an action for child support." (citing *Hester v. Hester*, 443 S.W.2d 28, 33 (Tenn. Ct. App. 1968))). As this Court held in *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005): "The parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's visitation do not provide justification for the parent's failure to support the child financially." Upon a review of the record, we find and hold, as did the Trial Court, that Petitioners had proven by clear and convincing evidence that Father abandoned the Child by failing to provide financial support for her. Therefore, this ground is affirmed.

We next address whether the Trial Court erred by finding that Father had abandoned the Child through his wanton disregard for the Child's welfare. Concerning this ground, Father argues that the Trial Court relied on criminal records that were not in the record in making its decision. Father specifically points to paragraphs two and six of the Trial Court's memorandum opinion, which included findings regarding criminal convictions, probation violations, a failed drug screen, and two stays at drug treatment facilities that had

not been completed. Upon review of the record, the Trial Court may have considered some evidence not properly admitted as evidence. However, the findings by the Trial Court that are supported by the record are clear and convincing evidence that Father had abandoned the Child by his wanton disregard for the Child's welfare.

Father testified that he had attended almost all of Mother's medical appointments when she was pregnant with the Child, but it is unclear exactly when Father found out about Mother's pregnancy with the Child. The Child was born in December 2015. Father takes issue with the Trial Court's finding concerning the two drug treatment programs that he did not complete. However, Father testified during trial to leaving both treatment facilities without completing treatment and to being terminated from Recovery Court. The record reflects that in June 2015, Father was arrested for simple possession of a controlled substance, to which he was convicted of in August 2015. As a result of this conviction, Father was sentenced to probation. Father was again arrested for and convicted of simple possession in October 2015.

Mother filed a petition for an order of protection in April 2018 in the Scott County General Sessions Court, alleging that Father had made threats to her of causing her harm and taking the Child. According to Mother's petition, Father had sent her text messages threatening to "run the car through the house" if she didn't speak to him. She stated that she feared for her life due to the things he had done to her in the past. Mother's petition reflected that Father had grabbed her by her shirt many times. According to Mother, Father had threatened to kill her and had previously stabbed a man, which made her believe he would harm her. The sessions court ultimately found that Father had done the things pled in the petition and the court adopted those as findings of fact. Therefore, the sessions court granted Mother's order of protection for a period of one year. As part of its order, the court awarded Mother custody of the Child and ordered Father to "successfully complete a program of substance abuse treatment, in-patient as approved by [the] court."

Father was arrested in June 2018 for attempted arson and ultimately pled guilty to such offense. As a result of this conviction, he was sentenced to two years' incarceration. Father was arrested in May 2018 for aggravated robbery, and ultimately pled guilty to robbery. As a result of this conviction, Father was sentenced to five years' incarceration to be served concurrently with the attempted arson sentence.

The Trial Court found that Father had taken Mother's employment income in order to purchase illegal drugs, that Mother had observed Father purchasing drugs on several occasions, that Father had used illegal drugs in front of Mother and the Child, and that Mother had observed Father "shooting up" drugs. These findings by the Trial Court were supported by the evidence at trial. The Trial Court made further findings concerning domestic violence by Father against Mother. Mother testified to several instances of domestic violence, some of which was in front of the Child. According to Mother, Father

- 18 -

had come to the home of one of her clients demanding that she leave or he would "wrap [her] car around a tree," which ultimately resulted in the house manager calling law enforcement. Mother testified that once when Father had been using methamphetamine, Father grabbed her by the neck and slid her down the wall while she had the Child in her arms. Additionally, Mother described an incident when Father had attempted to drag Mother out of the car in front of the Child and the Child kept saying to him, "Get off my mommy." Mother also testified that Father had "smacked" Mother across the face on several occasions.

This Court has held previously that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). In this case, Father, among other things, has criminal convictions, a history of domestic violence against Mother while the Child was present, used illegal drugs in front of the Child, left two drug treatment facilities without completing treatment, and used Mother's income to purchase illegal drugs. We find and hold, as did the Trial Court, that Petitioners have proven by clear and convincing evidence that Father abandoned the Child by his actions which demonstrated wanton disregard for the Child's welfare. We therefore affirm this ground for the termination of Father's parental rights.

The final issue we address is whether termination of Father's parental rights is in the Child's best interest. The factors to be considered by courts in determining whether termination of parental rights is in a child's best interest are set forth in statute as follows:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

- 19 -

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2020).

With regard to making a determination concerning a child's best interest, our Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H*., 483 S.W.3d at 523 (citing *In re Audrey S*., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S*., 455 S.W.3d at 555 (citing *In re Audrey S*., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the

- 20 -

parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its best interest analysis, the Trial Court considered each of the relevant enumerated factors in Tennessee Code Annotated § 36-1-113(i). With regard to each relevant factor, the Trial Court made findings of fact, and the evidence does not preponderate against those findings. The Trial Court found, among other things, that Father had not made adjustments to his conduct or circumstances such that it would be safe and in the Child's best interest to be placed in his home. Father acknowledged during trial that he had abused illegal drugs in the past. As the Trial Court found, Father had attended two separate drug treatment facilities but had absconded from both without completing them. The Trial Court found that Father had not maintained a meaningful relationship with the Child and that Father had been incarcerated intermittently since the Child's birth. Father also had been incarcerated continuously since May 5, 2018, when the Child was two years old.

The Trial Court further found that Father had engaged in drug activity in the home prior to his incarceration and that Mother had witnessed him "shoot up." Mother testified that she had observed Father purchasing drugs and that he had used drugs by "shooting up" in front of both her and the Child. Although Father denied that it ever happened, Mother testified of an incident when the Child was an infant and she observed Father "shooting up" while in the car with the Child right beside of him. Due to his regular drug use, the Trial Court found that those substances would render him consistently unable to safely care for the Child. Furthermore, the Trial Court found that Father never supported the Child financially but instead had used the funds he obtained, including those earned by Mother, to acquire illegal drugs. Conversely, the Trial Court found that the Child was in an "excellent home situation" with Mother and Stepfather and that the Child's needs were being met. According to the Trial Court, changing the Child's caretakers and physical environment would have a negative effect on the Child's emotional and psychological needs. Additionally, the Trial Court recognized that Stepfather was an excellent parental figure for the Child, providing financially and engaging in appropriate activities with the Child. The Trial Court found that Stepfather had provided Mother and the Child with "great stability."

After its consideration of all relevant statutory factors, the Trial Court found that termination of Father's parental rights was in the Child's best interest. Upon a review of the record, we find and hold that the evidence presented does not preponderate against the Trial Court's findings concerning the best interest analysis, and those factual findings by the Trial Court are clear and convincing evidence that termination of Father's parental rights was in the Child's best interest. Therefore, we affirm the Trial Court's finding in this regard.

## Conclusion

The judgment of the Trial Court terminating Father's parental rights to the Child is affirmed in all respects. This cause is remanded to the Trial Court for collection of the costs assessed below and for enforcement of the Trial Court's order terminating Father's parental rights to the Child. The costs on appeal are assessed against the appellant, John B., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE